## MIDGLEY et al. v. CAMPBELL BUILDING COMPANY.

No. 2142. Decided January 4, 1911 (112 Pac. 820).

1. EVIDENCE—ADMISSIONS—EFFECT. A contractor's voluntary admission that the materials used by a subcontractor were in accordance with the contract is sufficient to justify a finding to that effect as against the contractor. (Page 300.)

2. CONTRACTS—INSTRUCTIONS—WRITTEN CONTRACTS. It is proper for the court to charge the jury upon the uncontested effect of a written contract. (Page 303.)

3. EVIDENCE — PAROL EVIDENCE — VARYING WRITTEN INSTRUMENT. Where a written contract between a contractor and a subcontractor contained no requirements as to the use of any certain manufacturer's material, parol evidence of previous understandings on that point could not vary it. (Page 304.)

4. CONTRACTS—CONSTRUCTION—CONDITIONS—RIGHTS OF PURCHASER. Where a promisor agrees to pay for work or goods provided he is satisfied with them, he cannot, if dissatisfied, be made to accept and pay for them, but he cannot compel the other party to continue to do work or make goods until he is satisfied. (Page 305.)

5. CONTRACTS—CONSTRUCTION—CONDITIONS PRECEDENT TO PAYMENT OF PRICE. Where a subcontractor agreed in writing to put in the plumbing in a building according to certain specifications,

and to the satisfaction of the architect, but no particular manufacturer's goods were specified, though the contractor had already informed the architect that a certain manufacturer's materials were to be used, the architect could not arbitrarily condemn the use of other material of equally good quality. (Page 308.)

APPEAL from District Court, Third District; *Hon. Geo. G. Armstrong,* Judge.

Action by E. A. Midgley and another against the Campbell Building Company.

Judgment for plaintiffs. Defendant appeals.

AFFIRMED.

*Henderson, Pierce, Critchlow & Barrette* for appellant.

*Moyle & Van Cott* and *Powers* and *Marioneaux* for respondents.

APPELLANT'S POINTS.

The rule is well settled that where one undertakes to supply an article to the approval of the purchaser, no court or jury may substitute its approval for that of the purchaser. (6 Cyc. 617-618; *Tatum v. Geist* [Wash.], 89 Pac. 547; *Stottes v. Miller* [Iowa], 105 N. W. 127; *Inman Mfg. Co. v. American Cereal Co.* [Iowa], 100 N. W. 860; *Payne v. Roberts* [Pa.], 64 Atl. 86; *Singerly v. Thayer* [Pa.], 2 Atl. 230; *Silsby Mfg. Co. v. Town of Chico* [Cal.], 24 Fed. 893; *Plano Mfg. Co. v. Ellis* [Mich.], 35 N. W. 841; *Wood Machine Co. v. Smith* [Mich.], 15 N. W. 906; *Fairmount Plumbing Co. v. Carr* [W. Va.], 46 S. E. 458; *Barrett v. Coal Co.* [W. Va.], 90 Am. St. Rep. 802; *Hudson v. McCartney,* 33 Wis. 331; Waite on Engineering and Architectural Jurisprudence, p. 281; *Brown v. Foster,* 113 Mass. 136.) A right, question, or fact distinctly put in issue and directly determined by a court of competent jurisdiction, as a ground of recovery, cannot be disputed in a subsequent

suit between the same parties or their privies; and even if the second suit is for a different cause of action, the right, question, or fact, once so determined must, as between the same parties or their privies, be taken as conclusively established, so long as the judgment in the first suit remains unmodified. (*Southern Pacific R. R. Co. v. United States*, U. S. Sup. Ct. Rep., vol. 167, p. 355; *Russell v. Place*, 94 U. S. 606; *Smith v. Kernochen*, 48 U. S. 198; *Washington, etc., Co. v. Sickles*, 65 U. S. 24; *Cromwell v. Sac County*, 94 U. S. 351; *Campbell v. Rankin*, 99 U. S. 261; *Mason Lbr. Co. v. Buchtel*, 101 U. S. 638; *Bissell v. Spring Valley Township*, 124 U. S. 225; *Johnson Co. v. Wharton*, 152 U. S. 253; *Harrison v. Remington Paper Co.* (C. C. A.), 140 Fed. 385; *Franklin County v. German Savings Bank*, 142 U. S. 93; *Peay v. Salt Lake City*, 11 Utah 331; *Hodson v. U. P. Ry. Co.*, 14 Utah 402; *R. G. W. Railway Co. v. Telluride Power Co.*, 23 Utah 22.)

STRAUP, J.

In May, 1902, the government of the United States entered into a written contract with the appellant, the Campbell Building Company, to construct a government building at Salt Lake City, in accordance with plans and specifications prepared by the supervising architect. About twelve pages of typewriting of such plans and specifications relate to the plumbing of the building, in which are enumerated and described in detail the kind, character, quality, grade, etc., of each fixture and article to be furnished and used for such purpose. Such portion of the plans and specifications also contained a stipulation that "the required material and fixtures must in each case be in strict accordance with the specifications, and of the best quality and grade found in the market," and that "the contractor immediately after the award of the contract is to furnish for approval of the supervising architect the name and address of the manufacturer and catalogue number of the following named fixtures he proposes to use: Water-closets, urinals, slop sink, wall hydrants, fire hose rack, gate valves, pressure reducing valve,

basin faucets, shower bath, and water heater." Neither
in the contract between the government and the Campbell
Building Company, nor in the plans and specifications, was
it stipulated or provided that the material or fixtures to be
furnished and used should be made by any particular manu-
facturer. It, however, was made to appear by the evidence
that on the 6th of March, 1903, nearly one year after the
making of the contract between the government and the
Campbell Building Company, and about one year before the
Campbell Building Company entered into the contract with
the Midgley Brothers, the Campbell Building Company, by
letters, submitted to the supervising architect a list and cata-
logue number of the articles referred to, and gave Clow &
Sons as the name of the manufacturer, which were then ap-
proved by the supervising architect. On the 9th of March,
1904, after receiving and accepting one of several different
bids submitted by Midgley Brothers, the Campbell Building
Company entered into a contract with them to furnish the
material for, and to do the plumbing work of, the building,
by the terms of which Midgley Brothers agreed "to furnish
all and singular the materials and labor necessary to com-
plete the plumbing, gas fitting, sewerage, etc., under the
specification headings from page thirty-three and one-half to
forty-five, inclusive," relating to the plumbing, "all to be
in strict and full accordance with the plans, details and speci-
fications prepared by" the supervising architect. It was fur-
ther stipulated in their contract that the "second party
(Campbell Building Company) for and in consideration of
the first parties (Midgley Bros.) completing and faithfully
executing the aforesaid contract and by and at the time men-
tioned and to the full and complete satisfaction of the super-
vising architect, and the superintendent of construction, does
hereby agree to pay" Midgley Brothers, the sum of nine
thousand, five hundred dollars at the times and in the man-
ner specified in the contract. There is nothing contained in
the contract between the Campbell Building Company, and
Midgley Brothers requiring the latter to furnish or use fixt-
ures or material manufactured by Clow & Sons, or by any

particular manufacturer. So much of the plans and specifications prepared by the supervising architect as related to the plumbing was, however, made a part of their contract; but, as we have observed, the plans and specifications themselves did not require the fixtures or material furnished or used to be manufactured by Clow & Sons, but did require the Campbell Building Company to submit to the supervising architect the name and address of the manufacturer and the catalogue number of the fixtures proposed to be used, which, as before stated, was submitted to the supervising architect by the Campbell Building Company, and approved by him about one year before the making of the contract between the Campbell Building Company and Midgley Brothers. After the Midgleys had partly performed their contract by the furnishing and using of goods and material supplied by and purchased from Crane & Company, and had received partial payments for materials so furnished and used by them and for work done, and after they had purchased from Crane & Company, certain other fixtures and material—those in question—and had taken them to the building to be installed a controversy arose between the supervising architect, who was at Washington, D. C., and who had not been at or about the building, and who had no personal knowledge of the character or quality of the goods furnished by the Midgleys and the Campbell Building Company with respect to the question of whether such fixtures and material were purchased from, or supplied by, Clow & Sons. Because they were purchased from Crane & Company, and not from Clow & Sons, the supervising architect condemned and rejected them. The Campbell Building Company thereupon notified the Midgleys of such action taken by the architect, requested them to remove the fixtures, demanded that they furnish fixtures satisfactory to the architect, and proceed with their contract in accordance with the plans and specifications, and notified them that, upon their refusal or failure so to do, the Campbell Building Company would itself obtain such fixtures and complete the plumbing work, and hold the Midgleys responsible for any damages sustained by it. The Midg-

leys took the fixtures away, but refused to further proceed with the work. Thereupon the Campbell Building Company purchased fixtures from Clow & Sons, and completed the work at a cost in excess of that contracted for, occasioned by a higher price paid to Clow & Sons for the goods than was required to be paid to Crane & Company for the same goods. The Midgleys brought an action against the Campbell Building Company, seeking a reformation of the contract entered into between them and the Campbell Building Company. It was alleged by them that the written bid submitted by them to and accepted by the Campbell Building Company was based on fixtures to be furnished by Crane & Company, that such provision was a part of their agreement, and was intended to have been incorporated in and made a part of their written agreement, but by mutual mistake was omitted. Upon such a reformed contract, they alleged a breach on the part of the Campbell Building Company and claimed damages on account of it. The Campbell Building Company denied the allegations of the complaint, and alleged "that there was no agreement ever made at any time between plaintiffs and the defendant that the plaintiffs should furnish any certain manufacturer's goods, but it was expressly agreed that any goods furnished by the plaintiffs were to be in strict and full accordance with the plans, details, and specifications prepared by the supervising architect and to the full and complete satisfaction of the supervising architect, and the superintendent of construction" of the building, and that the contract, as heretofore set forth, expressed the true intention of the parties. It was further alleged by it that the goods furnished by the plaintiffs were not approved, but were rejected by the supervising architect. By way of counterclaim, the Campbell Building Company further alleged that on the 9th of March, 1904, it and the plaintiffs entered into a written contract in terms as heretofore set forth, whereby the plaintiffs agreed to do the plumbing work of the building in accordance with the plans and specifications and to the full and complete satisfaction of the supervising architect and the superintendent of construction; that the plain-

tiffs failed to perform the conditions of their contract, and neglected and refused "to perform the work and furnish the materials as therein agreed," by reason of which the Campbell Building Company was itself compelled to furnish material and complete the work agreed to be furnished and done by the plaintiffs, to its damage in the sum of eight hundred and twenty-three dollars. The issues presented by the complaint were first tried to the court who found them in favor of the defendant and against the plaintiffs, that the written contract as alleged by the defendants, and, as heretofore set forth, "expressed the intention of the parties and there was no mistake or fraud or omission connected with the execution thereof, nor was there any promise, agreement, or other parol stipulation connected therewith in any manner affecting said contract." The issues raised by the counterclaim were then tried to a jury. No other issues were tried and submitted to them. Upon such issues a verdict was rendered in favor of the plaintiffs and against the defendant, no cause of action. From the judgment entered upon the verdict, the Campbell Building Company has prosecuted this appeal.

It was made to appear without substantial conflict in the evidence, and was testified to by the superintendent of construction of the building, whose duty it was on behalf of the government to inspect the material and fixtures that went into the building and to see that they were in accordance with the plans and specifications prepared by the supervising architect, that the fixtures and articles furnished by the Midgleys and taken to the building by them and which were condemned and rejected by the order of the supervising architect "were in accordance with the plans, details, and specifications prepared by the supervising architect," and "were in quality and character in every way equal to the requirements of the plans, details, and specifications," and that they fell short in the "circumstance" only that they were supplied by and purchased from Crane & Company instead of Clow & Sons, and that such facts were reported by him to the supervising architect. It was also shown by the admis-

sions of the appellant in a letter written by its president and on its behalf to the superintendent of construction in June, 1905, and, after the controversy arose, that Clow & Sons did not manufacture plumbing fixtures of the kind in question, and that those furnished by the Midgleys "are strictly in accordance with those mentioned in our letter to the supervising architect dated May (March) 6, 1903. You will also find that these fixtures are exactly the same as shown in Clow's catalogue of 1902. We have reason to believe that these fixtures are manufactured by the same parties who manufacture for Clow." Other evidence was also adduced tending to show that many, if not all, of the kind of fixtures in question, were not manufactured by Clow & Sons, and that they, like Crane & Company, were but dealers in or jobbers of such goods, and that such kind of goods handled by both was manufactured by the same person or firm. But, aside from this, the admission of the appellant was itself sufficient to show, and to justify a finding to the effect, that the goods furnished by the Midgleys and proposed to be installed by them were strictly in accordance with those theretofore submitted by the Campbell Building Company to the supervising architect and approved by him, and were "exactly the same as shown in Clow's catalogue," and "were manufactured (as it believed) by the same parties who manufacture for Clow & Sons." While a litigant in a cause may not necessarily be concluded by his extrajudicial admission of facts, yet whatever is so voluntarily admitted by him against himself may reasonably be taken to be true; and he ordinarily may not complain if it is treated as true.

It was testified to by the Midgleys that at the time of the making of their contract with the Campbell Building Company they had no knowledge or notice that the latter had submitted to the supervising architect the name of Clow & Sons as the manufacturer. The president of the Campbell Building Company testified that such fact was made known to them prior to the making of the contract. But it is beyond dispute that in the written contract finally entered into

between them there is no covenant or agreement requiring the Midgleys to furnish goods manufactured by Clow & Sons. This is shown by the contract itself, by the allegations of the defendant's answer wherein it was alleged that "there was no agreement made at any time between the plaintiffs and defendant that the plaintiffs should furnish any certain manufacturer's goods," and was so testified to by the president of the Campbell Building Company. No question arose with respect to the manner in which the labor was performed. The only particular wherein it is claimed that the Midgleys had not performed the conditions of their contract is that the particular goods in question and furnished by them were supplied by and purchased from Crane & Company, and not from Clow & Sons, and for that reason did not satisfy the supervising architect, and on that ground were condemned and rejected by him, notwithstanding that they were as testified to by the superintendent of construction, and not disputed by the supervising architect, "in accordance with the plans, details, and specifications prepared by the supervising architect," and "were in quality and character in every way equal to the requirements of the plans, details, and specifications," and therefore were "of the best grade and quality found in the market," and were, as admitted by the Campbell Building Company itself "strictly in accordance with those submitted by it to the supervising architect and approved by him," and were "exactly the same as shown in Clow's catalogue," and were manufactured by the same persons or firm who manufactured for Clow & Sons.

The appellant requested the court to charge that under the terms of the contract the Midgleys were not only required to furnish material and to do the work in accordance with the plans and specifications, but that the work and material were also required to be to the satisfaction of the supervising architect, and that it was "their duty so to do the work, and so to furnish the materials," regardless of the question of whether the architect in condemning and rejecting the goods furnished by the Midgleys acted unreasonably; and, if they so failed and refused to furnish and install the

goods to the approval and satisfaction of the supervising architect, then they were liable to the Campbell Building Company to whatever damages were suffered by it by reason of such refusal and failure on their part. The court refused the request, and charged that the contract between the Midgley Brothers and the Campbell Building Company did not require the Midgleys to furnish goods manufactured or supplied by Clow & Sons; and, if the jury believed from the evidence that the goods which Midgley Brothers had furnished and taken to the building to be installed therein "were examined by the superintendent of construction and were found to be in accordance with the plans, details and specifications, but were thereupon condemned and rejected by the government representative solely because they were not manufactured or supplied by Clow & Sons," then Midgley Brothers had the right to decline to further proceed under the contract, and the Campbell Building Company in such case had no claim for damages against them for their failure to further proceed for such reason. The court further charged the jury that the clause in the contract whereby the Campbell Building Company agreed to pay Midgley Brothers in consideration of their faithful execution of the work "to the full and complete satisfaction of the supervising architect and superintendent of construction" in effect left to the judgment of the supervising architect and the superintendent of construction "whether the goods and work complied with the plans and specifications, and, if the goods and work did comply with the plans and specifications, they or either of them could not legally arbitrarily refuse to accept the same so as to make Midgley Brothers liable to the Campbell Building Company for damages for failure to supply work or goods other than that called for in the contract, or for the failure of Midgley Brothers to supply goods of a make not mentioned in the contract, and if you find from the evidence that the work performed and the goods supplied by Midgley Brothers were in accordance with the plans and specifications, and that the supervising architect and superintendent of construction did so arbitrarily refuse to accept

them because they were not of a certain make not authorized
in the contract and plans and specifications, you will find the
issues for the plaintiff Midgley Brothers." Appellant's ex-
ceptions to the court's refusal to charge as requested, and to
the charge as given, present the principal questions for a re-
view.

In view of the issues submitted to the jury and of the
evidence adduced, we think no error was committed. The
court correctly charged that the contract between the
Midgleys and the Campbell Building Company did            2
not require the former to furnish material or fixtures
manufactured or supplied by or purchased from Clow &
Sons. We have already adverted to that, and to the fact
that no stipulation or agreement was contained in the writ-
ten contract requiring the Midgleys to furnish material or
fixtures manufactured or supplied by Clow & Sons, or by
any particular manufacturer. If the Campbell Building
Company desired to have such a requirement imposed on the
Midgleys, not appearing on the face of the plans and speci-
fications submitted to them and made a part of their con-
tract, but which was brought into existence only because
of something done by the Campbell Building Company in
pursuance of the specifications, furnishing to the supervising
architect the name of Clow & Sons as the name of the man-
ufacturer, etc., such fact ought to have been embodied in the
written contract entered into between the Campbell Build-
ing Company and the Midgleys. If the fact of furnishing
to the architect the name of Clow & Sons as the manufacturer
was regarded as a part of the plans and specifications, some-
thing not appearing on the face of them but done in pursu-
ance and existing outside of them, then it was incumbent
upon it to have incorporated into the contract the whole,
and not only a part, of the plans and specifications. Writ-
ten contracts are to be regarded with some gravity; and the
presumption is indulged that all prior and contemporaneous
conversations and understandings are merged and embodied
within them. Hence the fact as testified to by the Midgleys
that they had no knowledge that the Campbell Building Com-

pany had furnished to the supervising architect the name of Clow & Sons as the manufacturer until after the making of their contract, and after they had purchased the goods from Crane & Company and had taken them to the building, or, as testified to by the president of the Campbell Building Company, that such fact was made known to them before the making of the contract is immaterial; for, in ascertaining the terms of the written contract—the binding contract between them—we must look to the covenants and agreements of that contract, and not to the prior or contemporaneous oral statements or conversations of the parties. And the jury were instructed that the court had already found and determined that the written contract, heretofore referred to, expressed the intention of the parties, that there were no other agreements or promises or oral stipulations affecting it, that the written contract must be accepted by them as containing all the agreements and stipulations between the parties, and that in considering it they could not consider any oral or other prior stipulation or agreement.

It, however, is urged by the appellant that because of the clause in the contract whereby the Campbell Building Company agreed to pay the Midgleys the sum of money therein specified in consideration of their "completely and faithfully executing the aforesaid work, and by and at the time mentioned, and to the full and complete satisfaction of the supervising architect and superintendent of construction," the supervising architect could properly reject or condemn the fixtures furnished and offered to be installed by the Midgleys, regardless of whether his action in so doing was wise or unwise, just or unjust, reasonable or unreasonable, capricious or otherwise. In other words, because of such clause in the contract obligating the Campbell Building Company to pay in consideration of the Midgleys executing the work to the "satisfaction of the supervising architect and superintendent of construction," it is urged that the supervising architect had the choice to accept the fixtures, or to reject them, if he was not satisfied, regardless of whether they were or were

not in strict accordance with the plans, details, and specifications, and that the ground or reason for his decision, or the propriety of it, cannot be inquired into except for fraud or bad faith; and if the Midgleys so failed or refused to furnish material to the satisfaction of the supervising architect, whether his decision was based on reasonable or unreasonable grounds, or whether his action in that regard was just or unjust, capricious or arbitrary, or otherwise, then such failure or refusal constituted a breach of their contract which rendered them liable in damages to the Campbell Building Company. And that in effect was what the appellant requested the court to charge. The appellant has referred us to numerous cases to the effect, and with which holdings we concur, that where a promisor agrees to pay for work or goods provided he is satisfied with them he cannot, if he is not satisfied, be made to accept and pay for them, or be compelled to pay for them if he rejects them; and that the right except for fraud or bad faith, to inquire into the ground for his action, is ordinarily excluded. In such case, when he has not accepted the goods or the benefit of the work, it generally is sufficient that he said he was "not satisfied." This principle, however, is more generally applied to cases involving taste, fancy, sensibility or judgment of the promisor. That is, if the subject-matter of the contract is a coat or a painting, for which the promisor agrees to pay, if the coat or the painting is to his satisfaction, he is not obligated to accept or pay for it, if he is not satisfied, though the coat may be of the best material and workmanship and style, or the painting executed in the most artistic and skillful manner and an exact likeness of the original. But this does not give the promisor a cause of action against the tailor or painter for damages for breach of contract because the coat or painting did not satisfy the fanciful tasts or capricious mental state of the promisor. It is quite enough that he in such case is not required to accept and pay for the coat or the painting, if he is not satisfied, without assigning any reason thereof, except that he is not satis-

fied. He may not, however, also insist that the tailor keep on making coats for him, or the painter painting pictures, until the indefinable and fanciful tastes of his mind is satisfied, and upon his refusal so to do subject him to a claim for damages for breach of contract. The principle has also been applied by some of the courts to questions involving not only fancy, taste, etc., but also to what is termed by them operative fitness or mechanical utility. References to the cases may be found in 9 Cyc. 617-624. But in most of them the principle was applied to cases where the satisfaction of the promisor was the chief or a prominent factor of the contract. Where the sale of a machine or steam engine is made chiefly upon the condition that it shall be to the satisfaction of the buyer, he ordinarily, according to some of the cases, is not compelled to accept it and pay for it, no matter how good or perfect or complete the machine or engine may be—it may be of the best—if the buyer is not satisfied with it and refuses to accept or offers to return it, though his action in the matter may be capricious or whimsical. Now, assuming that to be so, still that would not give the buyer the right where the vendor furnished and delivered to him the most perfect and complete machine or engine in the market, or the best that could be manufactured, to a cause of action against the vendor for damages for breach of contract because the machine or engine did not satisfy the capricious or fanciful mind of the buyer. We do not think the casees go to that extent. We think they are to the contrary.

As already observed, the case here tried and submitted to the jury was upon the appellant's counterclaim wherein it sought to recover damages from the Midgleys on the ground of their alleged breach of the contract. The case submitted to the jury is not one where the Midgleys are seeking to recover payment for goods furnished or work done by them which were not to the satisfaction of the appellant or of the supervising architect or the superintendent of construction. Conceding that under the clause referred to in the contract the Campbell Building Company was not obligated to pay for the execution of the work if it was not to the satisfaction

of the supervising architect and the superintendent of construction though the fixtures and material furnished and the work done were in strict accordance with the plans, details, and specifications, and that the supervising architect had the right to arbitrarily reject or condemn the fixtures furnished, still, if they were rejected or condemned in such case and in such manner and upon such ground, that by no means gave the Campbell Building Company the right to claim damages against Midgley Bros. for breach of the contract on their part. And that in effect was what the court charged the jury.

Furthemore, it does not appear to us that there is anything particularly sentimental or fanciful, or tasteful, about water-closets, urinals, slop sinks, or basin faucets, especially in a public building. It is chiefly requisite that they be sanitary, useful, suitable, and neat. The chief or controlling factor in the contract is not that the goods should satisfy the fancy, taste, or aesthetic sense of the supervising architect, or his mere whim or caprice in respect of their fitness or utility. The important thing in that regard is that the work was required to be done and the goods and fixtures furnished to be "in each case in strict accordance with the plans and specifications and of the best quality and grade found in the market," and the fixtures and goods to be of the kind, character, grade, quality, and description enumerated and described in the plans and specifications. The supervising architect was not dissatisfied because the goods and fixtures furnished by the Midgleys were not in strict accordance with such plans and specifications, or were not of the best quality and grade found in the market, or were not of the same kind, grade, character, and quality as theretofore submitted to him by the Campbell Building Company and approved by him. He was dissatisfied on the sole ground that the fixtures were purchased from Crane & Co., and not from Clow & Sons, and for that reason arbitrarily condemned and rejected them. At least there is much evidence to support a finding to that effect. If in such case the Midgleys, who had not agreed to furnish goods manufactured or

supplied by Clow & Sons, are liable to the Campbell Building Company for breach of contract on the sole ground that the supervising architect was "not satisfied," and for that reason arbitrarily rejected the goods, then would they also be so liable had they furnished goods manufactured or supplied by Clow & Sons, and had they been arbitrarily rejected by the architect solely because of his dissatisfaction in that they were not purchased from or supplied by Crane & Co.

We are of the opinion that the judgment rendered on the verdict finding the issues on the counterclaim in favor of the plaintiff and against the defendant, no cause of action, ought to be affirmed, with costs to the respondent. It is so ordered.

McCARTY, J., concurs.

FRICK, C. J.

I concur in the result. My first impressions were very strong that, in view of the whole record, the case at bar falls within that class where a contractor had agreed to furnish materials in accordance with the choice or direction of a person named in the contract, and where the choice of that person, although duly made, had been ignored. My associates, after a very careful consideration of the case, however, have arrived at a different conclusion. A just deference to their judgment induces me to yield my views to theirs. If the opinion of my Brethren is, however, to be construed to the effect, as I fear it may be, that a person in no case can recover as damages for breach of contract the difference between the cost of an article agreed to be furnished in accordance with the choice of a person agreed upon and some other article of the same kind just as good or better simply because the latter article is arbitrarily rejected by the person aforesaid upon the sole ground that the former was arbitrarily or for any reason chosen in preference to the latter, I must withhold my assent. I think that where A. agrees to furnish B. an article of a certain make, or one that is or may be sold only by a particular person or firm, B. has

the right to insist upon that very article as stipulated for by him, although there could be obtained in the market many like articles just as good or better. It is B.'s choice and not that of another that must control, since that is his right under the contract.