FRANCESCO J. GARDELLA *vs.* ANTONIO J. L. GARDELLA *et al.*

JUNE 10, 1929.

PRESENT: Stearns, C. J., Rathbun, Sweeney, and Barrows, JJ.

BARROWS, J.   After a verdict that "Francesco J. Gardella is not a person of unsound mind but is a person who from want of discretion in managing his estate, so spends, wastes or lessens his estate, or is likely so to do, that he may bring himself or family to want or suffering, or to render himself or family chargeable on the said city of Woonsocket for support and that a guardian for said Francesco J. Gardella should be appointed," Gardella is here on exceptions because of refusal of the trial court to grant a new trial, alleged errors in the admission and exclusion of evidence, refusals to charge, refusal to poll the jury on certain issues and refusal to direct a verdict for appellant.

The proceedings started in the Probate Court of Woonsocket on petition of all of appellant's living children, twelve in number, eight girls and four boys, asking that a guardian be appointed pursuant to General Laws 1923, Ch. 372, Sec. 7.   The prayer of the petition was granted.   The case on appeal went to the Superior Court for a jury trial, which resulted in the verdict above quoted.

The section of the statutes in question provides: "A probate court may appoint a guardian of the person and estate or of the person or estate of any . . . person of unsound mind . . . or of any person who . . . from want of discretion in managing his estate, so spends, wastes or lessens his estate or is likely so to do that he may

bring himself or his family to want or suffering, or may render himself or family chargeable upon the town for support."

We have held that this statute is applicable if want of discretion exists whatever its cause, *Angell* v. *North Providence*, 11 R. I. 187, and if there is likelihood of respondent or his family coming to want and becoming a public charge. *Hopkins* v. *Howard*, 20 R. I. 394. The reason is that neither a dependent family nor the town ought to be required to sit idly by until appellant's means of support have been dissipated before taking steps to prevent him or them from becoming public charges. Passing upon such a question necessarily involves an element of speculation, but this element is not different in kind from that involved in fixing damages for death by wrongful act and other cases. A speculative conclusion, however, may not be drawn without evidence. If the inference of future probability has been drawn by a jury and approved by the trial justice, this court's problem on review is whether such inferences reasonably could have been drawn from the evidence.

Adult children of appellant not entitled to support may not sustain such a petition merely by proof that their prospective inheritance may be lost. Cf. *Hadfield* v. *Cushing*, 35 R. I. 306. The statute is not designed to permit adult children to curb the action of a parent of sound mind and legal discretion in the disposition or management of his estate. It seeks to protect a spendthrift, his legal dependents and the town from his folly.

In the case before us appellees expressly disclaim that appellant was of unsound mind and, in spite of the erroneous insistence of the trial court on retaining this as an issue and presenting it to the jury, no harm resulted to appellant because the jury expressly found that he was not a person of unsound mind.

All of appellant's children, except the youngest, who was twenty years of age at the time of the trial, were adults. Several were living at home with him, one being a widow with

two children and another an invalid who will always need care. His wife was dead. The children not at home were married and some lived in tenements belonging to appellant. The danger of his family coming to want or becoming a public charge is thus seen to be small, and the verdict if supportable must rest largely on facts showing either that appellant has embarked on a ruinously wasteful course of conduct or that he is likely so to do with resultant danger of his becoming a public charge.

Counsel for appellees assert that our statute originated in 1742 and that no state has a precisely similar statute. 28 Am. Law Rev. 230. Many statutes are predicated on mental unsoundness. Ours is not.

The facts established that appellant was sixty-eight years old; that the mother of these petitioners died in 1921. She had borne appellant seventeen children. The wife and children had worked early and late in helping him build up a wholesale and retail fruit business, the boys all leaving school at an early age to work for their father. So successful had been the business that appellant in the course of thirty-six years had accumulated at least $75,000 of real estate and some testimony placed the value at about $125,000. After his wife's death his attention to his store was somewhat less but the business continued to be profitable until 1927, when it showed a loss. That year, on May 10, he gave the business to his sons. Its value does not definitely appear though the evidence fairly shows that the assets given the boys were worth at least $15,000. It also shows that, for some months after the transfer, the father continued to buy merchandise for the store much as he had done before. The boys explain this was due to their desire not to hurt his feelings and they complain that his buying was indiscreet.

Appellant also displayed a tendency to pay marked attention to women, one instance being to a married woman whose husband shot at her while in a restaurant where appellant also was. But the instance which was at the root of his present trouble was his attention to and becoming engaged,

on March 28, 1927, to a Mrs. Fillippi, who was thirty-eight years old and a divorced woman with a sixteen year old daughter. With Mrs. Fillippi appellant made an antenuptial agreement on May 11, 1927. She had lived for some time in one of his tenements where he spent much time and had a key thereto. There is no positive evidence of improprieties. His wife's estate had not been settled in 1927. He and his several children had continued to live in the house which she had owned but no administration had been taken out on her estate. In October of that year, without consulting the children, he applied for administration and the petition starting the present case was filed shortly thereafter. The former petition has remained in abeyance pending the determination of this case.

The antenuptial agreement to which reference has been made, provided that Mrs. Fillippi was to receive at his death $30,000 in lieu of dower rights and payment thereof was secured by his agreement not to alien or encumber certain real estate which should stand as security for payment of this sum. The agreement provided also that nothing therein should prevent her from receiving or appellant from leaving to her any other property by will or giving any other property to her during his lifetime.

Appellees at the trial attacked this settlement as evidencing the wiles of a scheming woman to get appellant's property away from him and then leave him in want. We fail to discover such evidence therein. Protection against such a likely contingency as his predecease was wisely and properly provided for. It was not clearly unreasonable. The portions relating to appellant's right to give and her right to receive gifts of land and other property during his life add to or detract nothing from the existing rights of either of them; nor do we think they warrant an inference of design on her part to get control of his property during his lifetime. We find nothing in the antenuptial agreement from which to draw an inference that the Fillippi woman was engaged in an attempt to get appellant's property and leave him dependent on the city for support.

The evidence of improvidence in the handling of his real estate or business is of the same trivial nature referred to in *Hopkins* v. *Howard, supra.* Instead of pointing to appellant's incapacity, it furnishes a basis upon which it would not be unfair to infer that petitioners were motivated more by desire to protect their own hoped-for interests than their father's present one. The real estate transactions may or may not involve errors of judgment but they do not establish such indiscretion as is required by statute to justify taking control of appellant's property from him. The evidence fails to furnish support for a reasonable inference that appellant *has* acted as a spendthrift.

Is there evidence upon which to support a finding that he is likely to so involve himself as to dissipate his property and become a public charge? If so it must be found in his overheard talk with Mrs. Fillippi about turning his property into money, going away and getting married; his statements that Mrs. Fillippi ought to get $60,000 instead of $30,000 in the settlement, and his reference to his children as "skunks" together with his attentions to women and the fact that after the engagement, because of asserted reasons connected with his church's attitude toward divorcees, he broke the engagement. These reasons were not legal excuses for breach of promise and the knowledge which prompted his action was as available to him before as after he made the contract to marry. His repudiation of his promise involved him at once in a breach of promise suit for $100,000 and an injunction to prevent disposition of his property pending the litigation. This suit was pending at the time of trial. It formed an important consideration in weighing what was likely to occur in future and in weighing appellant's want of discretion and danger of losing his property so as to become a public charge.

It is only the record as it stood before the jury that we may consider. Assuming it to be a fact, as stated by appellant in this court, that after the verdict appellant married Mrs. Fillippi, our review of whether the evidence supported

the verdict can not be affected thereby. That a distinct breach of his marriage promise was committed is not open to dispute. That such action involved him in a law suit wherein he might be heavily mulcted in damages is not open to question. That his relations with women might involve him in other similar situations was not an unwarranted inference. His instability in the Fillippi case and his relations with other women furnished a basis upon which a jury might infer a lack of discretion and find a likelihood of his endangering his property to such an extent as to render him a public charge. The size of his estate rendered him more likely to be preyed upon by designing women by whom he was likely to be enmeshed and who cared not for him but for his money. Under our law the question of what was likely to occur was one primarily for the jury, if reasonable men might differ in their conclusions. *Quinn* v. *Stedman*, 50 R. I. 153; *Riley* v. *Tsagarakis*, 145 Atl. 12. The trial justice, who saw and heard the witnesses, has approved the verdict and even though this court might not merely on the printed record have reached the same conclusion, a majority does not feel warranted in saying that no ground existed for a reasonable difference of opinion on the evidence.

In reaching this conclusion we have not overlooked the matters to which appellant's brief alludes, such as his life-long and close-fisted habits in spending money, his self-will, his refusal in September, 1927, to endorse a note for $10,000 in aid of a church building project at the request of his daughter, the vulgar speech to him from some of his sons, the hysterical outbursts of a daughter, both at the trial before a jury and in the probate court when testimony of her father's conduct at the time of her mother's death was put in. The evidence of appellant's treatment of his wife was perhaps remotely relevant. The trial justice's discretion must be relied on strongly as to the limits to which such evidence may go where an issue is as broad as the present one. Though the trial court's reasons for admitting some of this evidence were erroneous because he stated that admission was due to the issue of soundness of mind raised

in the pleadings, we are not prepared to say that admission of such testimony constituted reversible error.

Our discussion of the motion for new trial necessarily disposes of the contention that a verdict should have been directed for appellant.

We have examined the transcript and exceptions concerning the evidence with care. Such of the exceptions as were good were cured by subsequent testimony or the error was harmless. Of the requests to charge which were refused, some were covered in the charge given and refusal of any which might properly have been given was shown by the verdict to have constituted harmless error. No error was committed in refusing to poll the jury as to the specific elements entering into the general verdict in the absence of a request for special findings submitted to the jury.

The exceptions of the appellant are overruled and the case is remitted to the Superior Court for further proceedings following the verdict.

*Greene, Kennedy & Greene*, for appellant.
*Walling & Walling*, for appellees.